UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHILDREN'S HOSPITAL CORP.,          )
                                    )
    Plaintiff,                      )
                                    )          CIVIL ACTION NO.
v.                                  )          07-11985-DPW
                                    )
THE GEORGE WASHINGTON UNIVERSITY,   )
                                    )
    Defendant.                      )

MEMORANDUM AND ORDER
September 16, 2010

This diversity suit involves a dispute over the performance of a multi-year study supervised by Children's Hospital Corporation ("Children's").  The National Institues of Health ("NIH") provided Children's with a grant to research the molecular antecedents of brain damage in extremely premature newborns.  Children's subcontracted parts of the study to cooperating institutions, including the George Washington University ("GW"), whose task was to analyze blood samples gathered from newborns.  Children's makes several claims related to breach of contract and allegations of misrepresentation while GW submits parallel counterclaims.  The matter is before me on cross-motions for partial summary judgment.

## I.  BACKGROUND

### A.  The Proposed Study

In October 2000, Children's filed a grant application for a

study of the causes of brain damage in extremely low gestational age newborns ("ELGANs"), who have a higher risk of such damage and developmental disorders than other infants (the "Study"). The Study was to investigate what factors, or antecedents, were related to the brain damage observed in ELGANs.  One hypothesis to be tested was that these antecedents include certain proteins such as cytokines and growth factors - often referred to as "biomarkers" or "analytes."

The research design required the collection, through parental consent, of one to two drops of blood from ELGANs born at participating hospitals.  The blood would be collected on filter paper, then frozen for later analysis.  The challenge for the Study was how to adequately analyze the blood samples given that they consisted only of one or two drops.  The Study therefore proposed use of a technology called recycling immunoaffinity chromatography ("RIAC").  The more general process of immunoaffinity chromatography takes a liquid sample and runs it through a column filled with small beads, each of which is coated with an antibody specific to the biomarker under investigation.  When the liquid passes through the column, the biomarker in the blood sample adheres to its corresponding antibody on the beads.  A solvent then passes through the column to release both the biomarker and the antibody from the beads. After the biomarker is collected, a detection system measures the

sample and calculates the quantity of the biomarker present in the sample.  The process requires the disposal of any liquid left over from the sample after passing through the column.

By contrast, the RIAC method permits recycling the liquid sample that remains after passing through the column.  The excess liquid can run through additional columns, each with beads coated with antibodies that correspond to other biomarkers.  This allows a small blood sample to be tested for a large number of biomarkers.  The process could also be automated, which would accelerate the analysis.  Children's wanted to use the RIAC method to test ELGAN blood samples for particular biomarkers, thereby gaining more information from the limited size of the samples.

The principal investigator on the Study was Dr. Alan Leviton, a researcher at Children's.  Dr. Leviton submitted a grant proposal to the NIH on behalf of Children's in order to obtain funding for the ELGAN Study.  The grant, which the NIH ultimately approved, was a "consortium agreement," under which the grant recipient (here, Children's) would enter into separate agreements with various "cooperating institutions" (here, GW) to undertake discrete elements of the Study.  In relevant part, the ELGAN grant application contemplated that Children's would subcontract with GW to "provide ultra-micro analytical services for the measurement of analytes of interest in blood spots . . . . by recycling immunoaffinity chromatography."

**B.    Children's Agreement with GW**

GW, as part of the consortium, contracted with Children's to perform the analysis of biomarkers in the collected blood samples.  The parties identify several documents that, taken together, form the contract at issue in this matter.  The contract consists of the "General Terms and Conditions," the "Purchase Order" and subsequent modifications, the NIH Grants Policy Statement, and Children's original NIH Grant Application. The Purchase Order and subsequent modifications, signed by Children's and GW, specify the budget for GW's portion of the Study for a given period of time.  The Purchase Order incorporates by reference the General Terms and Conditions and the NIH Grants Policy Statement.  The General Terms and Conditions is a form document used by Children's for grant subcontractors to define terms and establish basic provisions such as equipment purchase and employee status.  The NIH Grants Policy Statement outlines the relationship between the NIH and the recipient and between the NIH and cooperating institutions, or subawardees, like GW.  The NIH Grant Application describes the scope of GW's proposed participation in the Study.

GW's particular obligations under the Study are subject to dispute, as will be discussed in greater detail in Part III.A.1. Generally, however, the "Budget Justification" section of the NIH Grant Application describes the expected scope of the investigation: "The current proposal requires chromatographic

-4-

separation of *up to* 100 biomarkers per sample on 10,000 samples (1 million individual analytes)." (emphasis added). Dr. Benjamin Dickens, the Project Director for GW's portion of the Study, was to use the RIAC method, requiring at least three years to complete the analysis: "Since the instruments can not be running 24 hours a day . . . this project will require 100% effort on all three machines for a minimum of full three years (1068 days)." This would require the use of three RIAC machines, Dr. Dickens's services, as well as the assistance of two technicians.

## C.  GW's Performance

The execution of the Study began in September 2001. GW maintains that, as of January 2005, Children's had not authorized GW to analyze any ELGAN blood spots. At that time, Dr. Dickens informed Children's that completion of the blood-spot analysis would require another 2.7 years. Dr. Leviton viewed this time period as "impractical" given that Boston Medical Center intended to apply for another NIH grant to fund a follow-on study ("ELGAN 2"). The NIH ultimately did not award the grant for ELGAN 2.

In November 2005, Dr. Thomas McElrath of Children's contacted Dr. Raina Fichorova at Brigham and Women's Hospital about using a non-RIAC technology, Meso Scale Discovery ("MSD"), to detect cytokines in blood spots. In April 2006, Dr. Leviton asked Dr. Fichorova for information about what the MSD platform

would be capable of doing with respect to a "wish list" of proteins.

For reasons that are disputed by the parties, Dr. Dickens had only completed analysis of sixty analytes in 954 samples by April 2006.  The parties also dispute whether Dr. Dickens demonstrated acceptable inter-assay variability, i.e., that if the same experiment was performed twice, the same result would occur, within an acceptable margin of error.

As Children's grew concerned about Dr. Dickens's execution of the Study, it arranged for an audit of the laboratory on May 31, 2006.  The auditor, Dr. Mark Cosentino, had experience auditing laboratories through his work for the National Cancer Institute's Office of Bio-Repository and Biospecimen Research, although he was not an expert in RIAC.  Dr. Cosentino found that Dr. Dickens was unable to get the equipment to function properly for demonstration purposes; one of the columns was aligned in standing water; samples were handled without gloves; there was a failure to determine the testing life of the columns on the machines; and there was a failure to perform true duplicate analyses.  Dr. Cosentino recommended that Dr. Dickens hire a technician in "Good Laboratory Practice" who was detail oriented. Due in part to Dr. Cosentino's findings, Dr. Deborah Hirtz, the NIH program officer responsible for the ELGAN Study, became concerned about the quality of results from Dr. Dickens's laboratory.

-6-

Children's terminated its contract with GW in August 2006 and contracted with Dr. Ficharova to perform the data collection and analysis that GW was unable to deliver.  Children's requested and was granted funding from the NIH under the ELGAN grant to pay for Dr. Ficharova's work.

## D.   Procedural History

Children's filed this diversity action against GW, alleging breach of contract (Count One), money had and received (Count Two), fraud (Count Three), and negligent misrepresentation (Count Four).  GW, for its part, alleges counterclaims of breach of contract (First Counterclaim), money had and received (Second Counterclaim), breach of the covenant of good faith and fair dealing (Third Counterclaim), and conversion (Fourth Counterclaim).  The parties have each moved for partial summary judgment.[1]  Only GW's Third Counterclaim for breach of the implied covenant of good faith and fair dealing remains unaddressed by the parties' respective summary judgment motions.  Nevertheless, because the good faith and fair dealing claim is substantively the same as GW's other counterclaims, I will address it here.

---

[1] Both parties move for summary judgment on Count One, Children's breach-of-contract claim, and as to GW's First Counterclaim (breach-of-contract).  Children's has also moved for summary judgment as to GW's Second Counterclaim (money had and received) and Fourth Counterclaim (conversion), while GW moves for summary judgment as to Children's Counts Two (money had and received), Three (fraud), and Four (negligent misrepresentation).

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008) (citation and quotation marks omitted).  The court must evaluate the record in the light most favorable to the nonmoving party. *P.R. Elec. Power Auth. v. Action Refund*, 515 F.3d 57, 62 (1st Cir. 2008).  Where both parties have moved for summary judgment, the standard of review is neither distorted nor diluted. *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

## III.  ANALYSIS

Because they are central to the dispute, I begin with the breach of contract claims.

### A.  Breach of Contract (Count One and First Counterclaim)

The parties do not dispute that Massachusetts law governs their contract dispute.  Under Massachusetts law, a plaintiff alleging a breach of contract must make four showings: (1) the parties entered into a contract; (2) the plaintiff was ready, willing, and able to perform under that contract; (3) the defendant breached that contract; and (4) the plaintiff sustained damages because of that breach. *Singarella v. City of Boston*,

173 N.E.2d 290, 291 (Mass. 1961).  Although the parties do not dispute the existence of an enforceable contract, they disagree on whether either party breached the agreement.

Underlying much of the parties' disagreement are differing views on how to interpret the contract.  The interpretation of a contract is a question of law for the court.  *Allstate Ins. Co. v. Bearce*, 589 N.E.2d 1235, 1238 (Mass. 1992).  Whether a contract is ambiguous is also a question of law.  *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989).  "Only if the contract is ambiguous is there an issue of fact for the jury." *Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992).

## 1.  Children's Breach-of-Contract Claim (Count One)

Children's primary argument is that GW breached the contract by failing to make 1 million measurements within the contract period.  Children's argues in the alternative that GW failed to use its "best efforts" or "good faith efforts" to perform under the contract.  I find that the evidence does not support a breach of contract claim for nonperformance by GW and further, even if such a breach were determined, that Children's suffered no cognizable damages.

### a.  1 Million Measurements

Neither party disputes that GW did not make 1 million measurements within three years.  They disagree, however, as to

whether GW had an enforceable obligation to achieve such a target under the agreement.

### I. The Relevant Language

The NIH Grant Application contains the only language in the agreement that discusses GW's obligations with respect to the scope and number of measurements required by the Study and the time frame intended for the completion of those measurements. The "Budget Justifications" section of the NIH Grant Application describes the equipment, personnel, and supplies needed to execute GW's portion of the Study.  The "Equipment" subsection outlines the need to upgrade GW's existing instruments and states that "[t]he current proposal requires chromatographic separation of up to 100 biomarkers per sample on 10,000 samples (1 million individual analytes)."  This is the only language in the application or other contractual documents that specifically refers to the number of analytes that Children's may have expected GW to process.

The "Equipment" subsection goes on to describe the time frame of the project: "Since the instruments can not be running 24 hours a day . . . this project will require 100% effort on all three machines for a minimum of full three years (1068 days)." Another reference to the duration of the project is found in the "Personnel" subsection of the "Budget Justification": "During roughly the first 6 months of this project, Dr. Dickens will be

involved with training the new technicians . . . . [T]he
following 36 months will be used to collect the data from the
blood spots . . . ."

>    *ii.  Incorporation*

The threshold question is whether the "Budget Justification"
section, which contains the language on which Children's relies,
is incorporated into Children's contract with GW.  The NIH Grant
Application, might after all, be viewed as merely a submission by
Children's to the NIH.

The parties' Purchase Order incorporates by reference
Children's General Terms and Conditions and the NIH Grants Policy
Statement.[2]  Section 1(e) of the General Terms and Conditions
states that the "Project Director" (here, Dr. Dickens) is
"responsible for the scientific and technical direction of its
portion of the Project *as set forth in the Grant application
(workscope), which is hereby incorporated and made part hereof*."[3]

I find that the General Terms and Conditions unambiguously
incorporate the entirety of the NIH Grant Application, not just
the "Scope of Work" section.  Although Section 1(e) refers
specifically to the "workscope" section, the purpose of that

---

[2] The Purchase Order states "The General Terms and
Conditions (attached) and NIH Grants Policy Statement . . . are
incorporated herein by reference and made a part thereof."

[3] Children's has conceded that the "Scope of Work" section
in the Grant Application is the same as the "workscope" section
referenced in the General Terms and Conditions.

parenthetical is merely to specify where in the NIH Grant Application the description of the Project Director's responsibilities can be located.  The "workscope" reference in no way limits the extent to which the NIH Grant Application is incorporated into the parties' contractual agreement.

> *iii.  GW's Obligations*

Although the entire NIH Grant Application is incorporated into the General Terms and Conditions, Dr. Dickens's obligations are unambiguously defined in the "Scope of Work" section of the NIH Grant Application.  The Project Director is "responsible for the scientific and technical direction of its portion of the Project as set forth in the Grant application (workscope)."  The "Scope of Work" section makes no reference to the number of analytes to be processed or the time frame in which the work must be completed.  GW therefore had no enforceable obligation to reach any specific target number of measurements.  That the language relied upon by Children's is found in the "Budget Justification" section supports this finding.  Grant proposals, in order to ensure adequate funding, may make expansive descriptions of the magnitude of work that the grantees expect and hope to accomplish.  Such projections of productivity, and the consequent budget needs, do not, however, necessarily create contractual obligations to meet each projection made in the context of a budget request.

Even if the language in the "Budget Justification" section were binding upon GW, it does not create an obligatory minimum target within a maximum time period. The "Budget Justification" section clearly states that the project involved the analysis of "*up to* 100 biomarkers per sample on 10,000 samples" and requires that those measurements be taken within "a *minimum* of full three years." (emphasis added). This language does not create contractual obligations, but rather describes the outer bounds of the proposed project.

### b. The Exercise of "Good Faith Efforts"

Section 1(e) of the General Terms and Conditions states that the "Project Director and Cooperating Institution shall exercise their good faith efforts in discharging their duties in the same manner as if they were the Principal Investigator and Grantee Institution, respectively." Children's argues that, even if GW's obligations did not include a one-million-analyte target and three-year time limit, GW nonetheless breached its "good faith" obligations under Section 1(e).[4]

---

[4] Children's argument on this issue refers to the contract as a "best efforts" contract, citing case law for the principle that "best efforts" and "good faith" clauses are equivalent. Of the two cases cited by the plaintiff, however, one is a First Circuit case applying Maine law, see *Triple-A Baseball Club Ass'n v. Ne. Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir. 1987), while the other involved a divorce decree that included the specific language "best efforts," see *Stabile v. Stabile*, 774 N.E.2d 673, 674 (Mass. App. Ct. 2002). Nevertheless, I will treat Children's position as a claim of a breach of the "good faith" clause in the General Terms and Conditions.

### I. Inter-Assay Variability

Children's alleges that GW failed to satisfy the "good faith" provision of the General Terms and Conditions in two ways: (1) by performing substantially less than what was promised in the agreement; and (2) by creating quality and reliability concerns that delayed the Study.

Children's argues, almost in passing, that the difference between what was promised (or, as I have determined, what was projected) in the NIH Grant Application and what was actually performed evidences a lack of good faith on the part of GW.  It is undisputed, however, that Children's did not authorize GW to begin testing samples until April 2005.  Given that Dr. Dickens estimated in January 2005 that it would take an additional 2.7 years to complete the measurements and analysis, the delayed authorization effectively made it impossible for GW to achieve the desired target of 1 million analytes before Children's terminated the relationship in August 2006.

Children's does not address the delay in authorization directly, but suggests that Children's could not authorize any testing by GW until the GW lab demonstrated inter-assay variability - that is, reliable testing methods.  Children's cites numerous examples of quality-control issues in the GW lab that prevented testing before that date: duplicate tests performed on successive days were systematically inconsistent; Dr. Dickens's error in programming an RIAC autosampler led to a

period of unacceptable inter-assay variability; and, at one point, Dr. Dickens was unable to detect analytes in a sample "spiked" with quantities of an analyte in order to test the machine's reliability.

None of the evidence regarding unacceptable inter-assay variability demonstrates a violation of the "good faith" provision of the General Terms and Conditions.  Children's appears correct in asserting that demonstrating inter-assay variability is required before testing on the samples could begin.  Children's may also be correct that GW's RIAC technology proved problematic in its ability to control inter-assay variability.  However, Children's has pointed to no evidence indicating that the GW lab's difficulties with inter-assay variability were a result of a lack of good faith on the part of GW or Dr. Dickens.  Children's was aware that RIAC was a novel technology whose use in the ELGAN Study required the manufacture of custom-built machines that would be untested upon arrival at the GW lab.  Furthermore, GW observes that Children's did not authorize testing until several months after GW successfully demonstrated inter-assay variability at the end of 2004.  This suggests that concerns regarding inter-assay variability were not the cause - or at least not the only cause - of Children's delay in authorizing testing.

The meaning of phrases such as "reasonably" and "good faith efforts" is "not reducible to a fixed formula, and varies with

the facts and the field of law involved." *Rey v. Lafferty*, 990 F.2d 1379, 1393 (1st Cir. 1993) (internal quotation marks omitted).  But, even though the "good faith" standard is without precise definition, I cannot permit this claim to proceed to trial without some more palpable evidence of a lack of good faith beyond Children's disappointment in the outcome of the Study and in the performance capacity of the selected technology.

## ii.  Dr. Cosentino's Audit

The plaintiff's remaining argument, which I presume is tethered to the "good faith" provision in Section 1(e), is that multiple problems were discovered during the audit by Dr. Cosentino.  Indeed, Dr. Cosentino identified several improper laboratory techniques, such as handling the samples without gloves and submerging one of the columns in standing water.

The audit, however, does not provide sufficient evidence of a failure to use "good faith efforts" to perform its duties in the same manner as if it were the principal investigator on the Study.  As with the other alleged breaches - failure to analyze 1 million analytes and failure to use "good faith efforts" in demonstrating inter-assay variability - I find as a matter of law that the evidence does not support Children's allegations of breach of contract.

Although I have found inadequate evidence to raise a factual question concerning an actual breach of contract by GW, I will, in the interest of completeness, also consider the damages

issues, assuming *arguendo* that there was sufficient evidence of the actual breach.

### c. Damages

Children's breach of contract claims must fail because Children's has not demonstrated that it suffered any damages resulting from the alleged noncompliance.

Children's points to two categories of economic loss.  The first relates to the cost of contracting Dr. Ficharova to perform the measurements and analysis that Dr. Dickens failed to complete.  The second is an alleged lost-opportunity cost that resulted from the NIH's denial of Boston Medical Center's ELGAN 2 grant application.

The first alleged loss presents a challenging standing issue given the peculiar context of federal grants and, more specifically, consortium grants under which the recipient acts as a conduit for federal funding to a third-party subawardee like GW.  Because Children's is ultimately distributing the NIH's money only after the NIH approves the expenditure, as opposed to paying GW out of its own funds, it is unclear whether Children's has standing to bring an action to recover allegedly misspent NIH funds.  However, I need not reach this issue because Children's has not identified any out-of-pocket loss to it resulting from

GW's purported inadequate performance.[5]

To be sure, Children's contends that the approximately $709,000 that it paid to Dr. Ficharova to complete Dr. Dickens's portion of the Study constitutes an out-of-pocket loss resulting from GW's purported breach.  However, Children's concedes that it paid Dr. Ficharova with money requested from and approved by the NIH for that specific purpose.  Children's counters that because that $709,000 went to Dr. Ficharova, it could not be used to fund other necessary elements of the Study.  Specifically, Children's argues that it would have used at least $438,403 to conduct follow-up studies on the sampled ELGAN infants, to interview their parents, and to "maintain the cohort," meaning to track the ELGANS and to ensure compliance with the Study's protocol. Although the parties failed to provide the entire NIH Grant Application to the court, one section of the application explicitly states that the scope of the ELGAN grant does not include follow-up examinations on the infants and that further grant applications - presumably, Boston Medical Center's ELGAN 2 - would include the necessary follow-up and maintenance.  The Study, in any case, had a five-year funding limit beginning in 2001, beyond which such maintenance and follow-up examinations

---

[5] Children's filed a motion seeking leave to file additional authority on the standing issue.  I will grant the motion (Docket No. 65), but, because I do not find the standing question dispositive here, I find the additional submission to be immaterial to either party's motion for summary judgment.

would not be covered by the ELGAN grant.  Children's, therefore, has failed to point to an identifiable and quantifiable economic loss that resulted from GW's alleged breach.  Consequently, even if Children's had standing to recover misspent NIH funding, it fails to make out the *prima facie* breach-of-contract claim necessary to survive summary judgment because it has not demonstrated any specific economic damages to it.

With respect to the second category of economic harm – the inability to fund other necessary elements of the study – Children's has shown neither standing nor causation.  Children's has no standing to pursue this argument because Boston Medical Center, not Children's, was the unsuccessful applicant for the ELGAN 2 grant.  Moreover, the record is silent as to the reasoning underlying the NIH's decision not to fund ELGAN 2. Children's admits that the NIH has refused, and has the right to refuse, to provide testimony about the deliberations of the group that makes NIH funding decisions.  Without any evidence connecting the NIH's funding decision to GW's alleged failure to perform under the original ELGAN Study, I find that there are no demonstrable damages here as a matter of law.

**2.  GW's Breach-of-Contract Claim (First Counterclaim)**

Both Children's and GW move for summary judgment on GW's First Counterclaim, in which GW alleges that Children's breached the contract by failing to pay GW for amounts billed to

Children's for work performed under the contract.  Because I find that GW has demonstrated that it is entitled to judgment as a matter of law, *see* Fed. R. Civ. P. 56(c), I will grant its motion for summary judgment on this counterclaim and deny Children's respective cross-motion for summary judgment as to this counterclaim.

Children's concedes that although the NIH approved payment of $43,059.56 for six outstanding invoices submitted by GW under the 2005-2006 modification to the Purchase Order, Children's has yet to pay for any portion of these invoices.  Children's claims that it is excused from payment because GW materially breached the contract and because the agreement was terminated in April 2006.  The termination is irrelevant; the outstanding invoices, submitted before April 2006, predate the August 2006 termination of the agreement and were submitted pursuant to the last modification to the Purchase Order, which covered December 1, 2005, through November 30, 2006.  Other than generally alleging excuse and poor performance, Children's presents no evidence that GW is not entitled to the $43,059.56 or that the work listed on the invoice was not completed by GW.  Children's concedes that until April 2006, all prior like invoices had been approved by the NIH and paid to GW by Children's.  There is nothing in the record to indicate that the work listed on *these* invoices was not similarly performed or that Children's failed to pay the last

invoice for any reason other than a generalized dissatisfaction with GW's performance.

Thus it appears that GW has presented evidence sufficient to show that no genuine issue of material fact remains regarding its entitlement to the $43,059.56 listed on the six unpaid invoices. Accordingly, I will deny Children's motion for summary judgment as to GW's First Counterclaim and grant summary judgment to GW as to that counterclaim with respect to the $43,059.56 remaining unpaid.

## B.   Money Had and Received (Count Two and Second Counterclaim)

Neither party has a viable claim for money had and received, and I will grant each party's motion for summary judgment as to the opposing party's claim.

An action for money had and received seeks "to recover money which should not in justice be retained by the defendant, and which in equity and good conscience should be paid to the plaintiff."  *Stone & Webster Eng'g Corp. v. First Nat'l Bank & Trust Co. of Greenfield*, 184 N.E.2d 358, 360 (Mass. 1962) (internal quotation marks omitted).  This is an equitable action, available only when remedies at law are inadequate.  *Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23, 29 (D. Mass. 2006).

The parties do not dispute that they had an enforceable contract, and that both parties can seek remedies under a cause

of action for breach of contract.  Neither party, therefore, can pursue an equitable claim for money had and received.  I will grant the defendant's motion as to Children's Count Two, and the plaintiff's motion as to GW's Second Counterclaim.

## C.   Children's Claim of Fraud (Count Three)

GW requests summary judgment against Children's Count Three, which alleges fraud on the part of the defendant.  A claim of fraud requires proof "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon" and that the plaintiff relied and acted upon the representation as true.  *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 837 N.E.2d 1121, 1134 (Mass. 2005) (citation omitted).

Children's alleges three false representations.  First, Children's claims that GW falsely represented that RIAC would measure up to 100 analytes per sample.  Children's has not shown that this statement was a representation of fact, and not a mere projection of possible future capacity.  The evidence that Children's identifies on this matter is Dr. Dickens's admission that he had only a "hope" of  accomplishing this goal.  This does not make the statement a representation of fact.  Indeed, the language "up to 100 [analytes] per sample" appears amidst a set of projections in a budget request; such projections in this context are essentially aspirational, they are not

representations of facts that will necessarily occur. A reasonable jury could not infer from Dr. Dickens's comments about his "hopes" that he falsely represented the capacity of the RIAC technology.

Children's cites *Rodi v. Southern New England School of Law*, 389 F.3d 5, 14 (1st Cir. 2004), for the principle that a "statement, though couched in terms of opinion, may constitute a statement of fact if it may reasonably be understood . . . as implying the existence of facts that justify the statement." But Children's could not reasonably have understood a statement in a budget proposal to be implying the existence of facts regarding what RIAC would actually achieve - especially given that Children's itself had encouraged Dr. Dickens to provide as positive an opinion as he could about RIAC in the "Budget Justification" section.

Children's also has not pointed to any evidence in the record that indicates either that it was false to state that RIAC could measure up to 100 analytes per sample or that GW (specifically, Dr. Dickens) knew this statement to be false. Dr. Dickens was making predictions about an untested, novel technology; there is nothing to suggest that he knew such predictions were inaccurate or unachievable. There is no demonstrated falsity upon which to ground a claim of fraud. Where the non-moving party has not adduced evidence sufficient to show the existence of an "element essential to that party's

-23-

case," I must grant summary judgment for the moving party.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The second allegedly false representation is the "implied
assertion" that RIAC could produce valid and reproducible
results.  While fraud can include a circumstance in which a
defendant implies the existence of facts that justify the
statement, *Rodi*, 389 F.3d at 14, Children's fails to identify an
actual representation.  The record indicates that Children's
belief in the capability of the RIAC technology originated from
Dr. Leviton's own knowledge, not from Dr. Dickens's
communications regarding the technology.  Therefore, not only
does the record include no evidence of a representation, but it
also includes no evidence of the plaintiff's reliance on that
representation.

Third, Children's alleges that GW implied that the RIAC
technology could "scale up" to the technology needed for the
Study.  To support this allegation in its opposition to summary
judgment, Children's simply speculates that, given GW's limits in
the pace of the analysis, "perhaps Dr. Dickens would not have
been able to scale up the RIAC platform."  Simple speculation is
not sufficient to demonstrate a factual dispute regarding the
falsity of the statement.

Because Children's has not presented any viable claim of
fraud, the defendant is entitled to summary judgment as to Count
Three.

**D.   Children's Negligent Misrepresentation Claim (Count Four)**

GW also seeks summary judgment as to Children's Count Four, which alleges negligent misrepresentation for the same representations alleged to underlie the fraud claim.  A negligent misrepresentation claim requires showing that the defendant

> (1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information.

*Golber v. BayBank Valley Trust Co.*, 704 N.E.2d 1191, 1192 (Mass. App. Ct. 1999) (internal quotation marks omitted).

Children's claim of negligent misrepresentation fails for several reasons.  First, as discussed in the context of the fraud claim, there is no indication that GW provided false information to Children's.  Second, Children's adduces no evidence of GW's failure to exercise reasonable care or competence in communicating this information to Children's.  I therefore will grant the defendant's motion for summary judgment as to Count Four of the plaintiff's complaint.

**E.   GW's Conversion Claim (Fourth Counterclaim)**

Children's seeks summary judgment as to GW's Fourth Counterclaim, a conversion claim.  The tort of conversion occurs when "[o]ne who intentionally or wrongfully exercises acts of

ownership, control or dominion over personal property to which he has no right of possession at the time." *Abington Nat'l Bank v. Ashwood Homes, Inc.*, 475 N.E.2d 1230, 1233 (Mass. App. Ct. 1985).

Children's basis for challenging GW's counterclaim is that GW lacks standing to obtain relief under a conversion theory. Children's contends that if the NIH provided funds to Children's for the purpose of paying GW, which Children's has failed to do, then these are misspent funds that the NIH alone has the right to recover.

The NIH Grants Policy Statement, which is incorporated by reference into the Purchase Order between GW and Children's, states that the "NIH may administratively recover funds paid to a grantee in excess of the amount to which the grantee is finally determined to be entitled under the terms and condition of the award, including misspent funds . . . ." In its Opposition memorandum, GW ultimately concedes that the NIH has the sole authority to recover misspent funds. Because GW has failed to provide support for its own claim of conversion by Children's, I will grant Children's motion for summary judgment as to GW's Fourth Counterclaim. *See Celotex*, 477 U.S. at 322-23.

### F. GW's Claim of Breach of Good Faith and Fair Dealing (Third Counterclaim)

Because GW's counterclaim for breach of good faith and fair dealing is substantively indistinguishable from its claims of breach of contract, conversion, and money had and received, I

address it here despite the fact that neither party moved for summary judgment on it.  GW alleges that by terminating the agreement, delaying authorization of testing, and not paying GW for work performed, Children's violated its implied duty of good faith and fair dealing.

GW concedes that Children's could terminate its contract at any time with thirty-days notice and for any reason.  Therefore, any claim challenging the reasons for termination - apart from some violation of public policy - cannot constitute a breach of good faith.  Moreover, GW cannot otherwise demonstrate a claim of breach of good faith and fair dealing with respect to the $43,059.56 billed in the outstanding invoices.  A breach of good faith and fair dealing is not implicated when, as here, there is genuine dispute over a colorable claim of nonperformance as an excuse for nonpayment.  In any event, my disposition of GW's breach-of-contract counterclaim in favor of GW obviates the need to address GW's breach of good faith and fair dealing counterclaim in any greater detail, since recovery would be duplicative.  Consequently, I will grant Children's motion for summary judgment as to Third Counterclaim.

## IV.   CONCLUSION

For the foregoing reasons, I GRANT Children's motion for leave to file additional authority (Docket No. 65); I DENY Children's motion for summary judgment as to its Count One and GW's First Counterclaim and GRANT Children's motion as to GW's

Second, Third, and Fourth Counterclaims (Docket No. 45); and I GRANT GW's motion for summary judgment as to its First Counterclaim and as to Children's Counts One, Two, Three, and Four (Docket NO. 50).  Accordingly, I direct the Clerk to enter judgment for GW in the amount of $43,059.56 with pre-judgment interest in accordance with MASS. GEN. LAWS ch. 231, § 6C running from the date(s) of the unpaid invoices.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE